FILED IN
COURT OF CRIMINAL APPEALS

March 3, 2015

ABEL ACOSTA, CLERK

AP-77,024
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 2/27/2015 8:39:17 PM
Accepted 3/3/2015 7:58:30 AM
ABEL ACOSTA
CLERK

No. AP-77,024

**IN THE**
**COURT OF CRIMINAL APPEALS**
**OF TEXAS**
**SITTING AT AUSTIN, TEXAS**

_____

ALBERT LESLIE LOVE, Jr.,

*APPELLANT*

V.

THE STATE OF TEXAS

_____

AN APPEAL OF A CONVICTION FOR
CAPITAL MURDER
CAUSE NO. 2011-1511-C1
FROM THE 19TH JUDICIAL DISTRICT COURT OF
MCLENNAN COUNTY, TEXAS

_____

**STATE'S BRIEF**

_____

ABELINO "ABEL" REYNA
Criminal District Attorney
McLennan County, Texas

STERLING HARMON
Appellate Division Chief
State Bar No. 09019700

219 North 6th Street, Suite 200
Waco, Texas 76701
[Tel.] (254) 757-5084
[Fax] (254) 757-5021
[Email]
sterling.harmon@co.mclennan.tx.us

i

# Identity of Parties and Counsel

| | |
|---|---|
| **Appellant** | Albert Leslie Love, Jr. |
| **Appellant's Trial Attorneys** | Mr. Jon Evans<br>Mr. John Donahue |
| **Appellant's Attorney on Appeal** | Mr. Ariel Payan<br>1012 Rio Grande<br>Austin, Texas 78701 |
| **State's Trial Attorneys** | Mr. Abelino 'Abel' Reyna,<br>Criminal District Attorney;<br>Mr. Gregory Davis<br>Mr. Michael Jarrett<br>Ms. Hilary LaBorde,<br>Assistant Criminal District<br>Attorneys<br>219 North 6th Street, Suite 200<br>Waco, Texas 76701 |
| **State's Attorney on Appeal** | Abelino 'Abel' Reyna<br>Criminal District Attorney<br>Sterling Harmon<br>Appellate Division Chief<br>219 North 6th Street, Suite 200<br>Waco, Texas 76701 |

# Table of Contents

## Table of Contents

Identity of Parties and Counsel.................................................................................ii

Table of Contents ......................................................................................................iii

TABLE OF AUTHORITIES...........................................................................................v

Issues Presented   …………………………………………………………….. ix

Statement Regarding Oral Argument   …………………………………….. x

Factual Overview …………………………………………………………… 1

Point of Error 1   …………………………………………………………… 9

    Statement of Facts …………………………………………………………9

    Argument   …………………………………………………………… 12

Point of Error 2   …………………………………………………………… 15

    Statement of Facts   ………………………………………………… 15

    Argument   ………………………………………………………… 17

Point of Error 3   …………………………………………………………… 19

    Statement of Facts ……………………………………………….. 19

    Argument …………………………………………………………………23

Point of Error 4   ……………………………………………………….. 25

    Statement of Facts ………………………………………………… 25

    Argument   ………………………………………………………… 27

Point of Error 5   ……………………………………………………… 29

Statement of Facts ……………………………………………… 29

Argument ……………………………………………………… 31

Point of Error 6 ……………………………………………… 33

Statement of Facts ……………………………………………… 33

Argument ……………………………………………………… 36

Point of Error 7, 8…………………………………………….. 41

Statement of Facts ………………………………………………41

Argument ……………………………………………………… 42

Point of Error 9 ……………………………………………… 44

Statement of Facts ……………………………………………… 44

Argument ……………………………………………………… 44

Point of Error 10 ……………………………………………… 46

Statement of Facts …………………………………………….. 46

Argument ……………………………………………………… 46

Point of Error 11 …………………………………………….. 47

Statement of Facts ……………………………………………… 47

Argument …………………………………………………….. 48

Prayer …………………………………………………….…… 49

Certificate of Compliance ................................................................50

Certificate of Service ......................................................................50

# TABLE OF AUTHORITIES

**U.S. Constitutional Provisions**

*U.S. Const. amend. VI* ……………………………………………………… 29, 32

*U.S. Const. amend. XIV* …………………………………………………… 17

**Federal Opinions**

*Batson v. Kentucky*, 476 U.S. 79,
106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) ………. vii, 15-16, 17, 18, 19, 47, 48

*Crawford v. Washington*, 541 U.S. 36,
124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) ……………………… 28, 32, 39

*Duren v. Missouri*, 439 U.S. 357,
99 S. Ct. 664, 58 L. Ed. 2d 579 (1979) …………………………………48, 49

*Riley v. California*, ___ U.S. ___, 2014 WL 2864484 (2014) ……………….. 40
124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) …………………………….28, 32, 39

*Snyder v. Louisiana*, 552 U.S. 472,
128 S.Ct. 1203, 170 L.Ed. 2d 175 (2009) …………………………… 17, 18

*United States v. Branch*, 989 F. 2d 752 (5th Cir. 1993)………………… 18, 19

*United States v. Fernandez*, 887 F. 2d 564 (5th Cir. 1989)………………… 17

**Texas State Opinions**

*Armendariz v. State*, 123 S.W. 3d 401 (Tex. Crim. App. 2007),
*cert. denied*, 541 U.S. 974, 124 S.Ct. 1883, 158 L.Ed. 2d 469 (2004) ……… 38

*Cardenas v. State*, 325 S.W. 3d 179 (Tex. Crim. App. 2010) ……………….. 12

*Chapman v. State*, 115 S.W. 3d 1 (Tex. Crim. App. 2003) ……………….. 42, 43

*Cumbo v. State*, 760 S.W. 2d 251 (Tex. Crim. App. 1988) …………………. 13

*De La Paz v. State*, 279 S.W. 3d 336 (Tex. Crim. App. 2009) ………… 27, 28

*Emery v. State*, 881 S.W. 2d 702 (Tex. Crim. App. 1994) …………………… 43

*Feldman v. State*, 71 S.W. 3d 738 (Tex. Crim. App. 2002) …………….. 12, 13

*Garcia v. State*, 126 S.W. 3d 921 (Tex. Crim. App. 2004) …………………… 40

*Gardner v. State*, 306 S.W. 3d 274 (Tex. Crim. App. 2009) ………………… 13

*Gigliobianco v. State*, 210 S.W. 3d 637 (Tex. Crim. App. 2006) ............... 27

*Guzman v. State*, 85 S.W. 3d 242 (Tex. Crim. App. 2002) ................…... 17

*Johnson v. State*, 967 S.W. 2d 410 (Tex. Crim. App. 1998) ...................... 41

*Johnson v. State*, 145 S.W. 3d 215 (Tex. Crim. App. 2004) ............….. 23, 24, 25

*Jones v. State*, 982 S.W. 2d 386, 390 (Tex. Crim. App. 1998)
    *cert. denied*, 528 U.S. 985, 145 L. Ed. 2d 362, 120 S. Ct. 444 (1999) …… 13

*Keeton v. State*, 749 S.W. 2d 861 (Tex. Crim. App. 1988) ..................…... 19

*Martinez v. State*, 327 S.W. 3d 727 (Tex. Crim. App. 2010) ................... 27

*McCarthy v. State*, 257 S.W. 3d 238 (Tex. Crim. App. 2008) ...............…... 31

*Mitchell v. State*, 931 S.W. 2d 950 (Tex. Crim. App. 1996) ..................... 43

*Montgomery v. State*, 810 S.W. 2d 372 (Tex. Crim. App. 1991)

    (*opinion on rehearing*) ………………………..……… 24, 25, 27, 33, 45

*Moses v. State*, 105 S.W. 3d 622 (Tex. Crim. App. 2003)…………..………… 24

*Padron v. State*, 988 S.W. 2d 344 (Tex. App. – Houston [1st Dist.] 1999)… 43

*Rachal v. State*, 917 S.W. 2d 799 (Tex. Crim. App. 1996) ..................…... 13

*Ransom v. State*, 920 S.W. 2d 288 (Tex. Crim. App. 1996) ................….. 24

*Rousseau v. State*, 824 S.W. 2d 579 (Tex. Crim. App. 1992)…………….....…18

*Russeau v. State*, 171 S.W.3d 871 (Tex. Crim. App. 2005) ..................…... 13

*Sauceda v. State*, 129 S.W. 3d 116 (Tex. Crim. App. 2004) .................... 24

*Swearingen v. State*, 101 S.W. 3d 89 (Tex. Crim. App. 2003) ............ 12, 13

*State v. Garcia-Cantu*, 253 S.W. 3d 236 (Tex. Crim. App. 2008)…............ 38

*State v. Kelly*, 204 S.W. 3d 808 (Tex. Crim. App. 2006) ................. 37, 38

*State v. Stevens*, 235 S.W. 3d 736 (Tex. Crim. App. 2007)………………... 38

*Tienda v. State*, 358 S.W. 3d 633 (Tex. Crim. App. 2012)…………………… 45

*Tong v. State*, 25 S.W. 3d 707 (Tex. Crim. App. 2000) ........................… 38

*Wall v. State*, 184 S.W. 3d 730 (Tex. Crim. App. 2006) ..................…... 32, 33

*Wiede v. State*, 214 S.W. 3d 17 (Tex. Crim. App. 2007) …………………… 37

*Wilson v. State*, 71 S.W. 3d 346 (Tex. Crim. App. 2002) ........................ 36

*Young v. State*, 283 S.W. 3d 854 (Tex. Crim. App. 2009)
    *cert. denied* 558 U.S. 1093, 130 S.Ct. 1015, 175 L.Ed. 2d 622 (2009)…17, 18

*Zuliani v. State*, 97 S.W. 3d 589 (Tex. Crim. App. 2003) ........................ 31

**Federal Statutes and Codes**

*18 USCA §2703(c)(d)*…………………………………………………… 40

*18 USCA §2703(d)*………………………………………………….. 40

**Texas Statutes and Codes**

*Tex. Code Crim. Proc.* Art. 35.16(b)(3)……………………………………… 12

*Tex. Code Crim. Proc.* Art. 35.261 ………………………………………… 17

*Tex. Code Crim. Proc.* Art. 35.261(a)……………………………………… 18

*Tex. Code Crim. Proc.* Art. 37.071 §2(a)(1)……………………………….. 42

*Tex. Code Crim. Proc.* Art. 38.22 ………………………………………… 42

**Rules**

*Tex. R. App. P.* 9.4(e) ……………………………………………….. 50

*Tex. R. App. P.* 9.4(i) ......................................................................... 50

*Tex. R. App. P.* 9.4(i)(1) ................................................................. 50

*Tex. R. App. P.* 33.1 ......................................................................... 36

*Tex. R. App. P.* 38.1(e) ..................................................................... viii

*Tex. R. App. P.* 38.1(h) ..................................................................... 38

*Tex. R. App. P.* 44.2(b) ..................................................................... 40

*Tex. R. App. P.* 71.3 ......................................................................... viii

*Tex. R. Evid.* 104(a) ……………………………………………… 44

*Tex. R. Evid.* 401 …………………………………….. 23, 38, 44

*Tex. R. Evid.* 402 ………………………………………………….. 44

*Tex. R. Evid.* 403 …………………………………………………… 23, 24, 25, 27

*Tex. R. Evid.* 404(b) …………………………………………….. 23, 24, 27

*Tex. R. Evid.* 801(d) …………………………………………… 39

*Tex. R. Evid.* 803(2) ………………………………………….. 31, 39

*Tex. R. Evid.* 901(a) …………………………………………… 44

# Issues Presented

*Appellant's Issues Presented*:

1. Did the trial court err in improperly granting two (sic) of the State's challenges for cause?
2. Did the trial court err in denying Appellant's *Batson* challenge to the State's peremptory strike of an African-American venireperson?
3. Did the trial court err in allowing the admission of an extraneous bad act?
4. Did the trial court err in allowing into evidence items seized in a search of a co-defendant's vehicle?
5. Did the trial court err in admitting into evidence a hearsay statement of a co-defendant made prior to the commission of the offense and not in furtherance of a conspiracy?
6. Did the trial court err in admitting into evidence cellular telephone records in violation of Appellant's federal and state constitutional rights?
7. Did the trial court err in admitting into evidence a compelled statement of Appellant?
8. Were Appellant's state and federal due process rights violated because the trial court allowed the jury to consider an admission by Appellant, without corroboration?
9. Did the trial court err by admitting letters and drawings made by Appellant?
10. Did the trial court err in admitting a music video into evidence?
11. Did the trial court err in refusing to ensure that the venire represented a fair racial proportion reflective of the county in which the offense was committed?

## Statement Regarding Oral Argument

Pursuant to Tex. R. App. Pro. 38.1(e) and 71.3, the State does not believe that the issues presented in this appeal are of such a nature that the Court's decisional process would be aided by oral argument, and oral argument is not requested.

# FACTUAL OVERVIEW

On March 28, 2011, Tyus Sneed and Keenan Hubert were shot to death while sitting in the backseat of a car at the Lakewood Villas Apartments in Waco, McLennan County, Texas. (RR XXXIII – 74-89). Each of the victims was shot eight times. (RR XXXV – 15, 32).

Emuel Bowers, III had been murdered on April 8, 2010. (RR XXXIII – 9, 13). Associates of Bowers concluded that Keenan Hubert was responsible for Bowers' death. (RR XXXIII – 32-33). These associates included brothers Rickey Cummings and D'Arvis Cummings, and Appellant. (RR XXXII – 84-86). Appellant and the Cummings brothers had grown up with Bowers, who was also known by the nicknames, "T-Bucks," and "Man-Man." (RR XXXII – 161-162). The parties were also close to Bowers' mother Shelia Bowers, his uncle Freddie Hilliard, and his wife Shianese Iglehart. (RR XXXII 158-160, 173-174).

On the afternoon of April 8, 2010, Bowers was living with his wife and child in Waco. (RR XXXII – 162). Around 6:00 p.m., Bowers drove to Hood Street Park to meet someone for a drug transaction. (RR XXXII – 166). While Bowers sat in his parked car, someone shot and killed him. (RR XXXIII – 13).

A bystander, Theresa Salazar, seeing Bowers, called Rickey Cummings and told him he needed to come to the park. (RR XXXII – 96). Cummings went to the park, arriving before the police. (RR XXXII – 119). On arrival, Cummings took possession of Bowers' phone, and began calling members

1

of the Bowers family. (RR XXXII – 169). He also checked through Bowers' phone to see who Bowers has been in recent contact with. (RR XXXII – 119).

Paul Hall, a drug associate of Bowers', called Bowers' phone at this time, and Cummings answered. (RR XXXII – 119). Hall was supposed to meet with Bowers for a drug deal, but Bowers never showed. (RR XXXII – 115-116). Hall had called Bowers' phone to find out what had happened. (RR XXXII – 119).

After the brief conversation between Hall and Cummings, Cummings went to Hall's apartment with a group of men, which included Appellant and D'Arvis Cummings. (RR XXXII – 122). Hall was able to persuade the group that he had nothing to do with Bowers' murder, but the confrontation so frightened him that he quit his job and obtained a handgun for personal protection. (RR XXXII – 125-127).

At Bowers' funeral, his associates, including Appellant and the Cummings brothers, wore red military-style shirts with the word "Combat" emblazoned over the heart. (RR XXXII – 173-175). The initial investigation into Bowers' murder turned up no eyewitnesses, no murder weapon, and no forensic evidence. (RR XXXIII – 17-18). After Hall was quickly eliminated as a suspect, the police investigation stalled. (RR XXXIII – 26). The lead investigator on the Bowers case was Waco Police Detective Mike Alston. (RR XXXIII – 7-71). Bowers' family, particularly Shelia Bowers and Freddie Hilliard, became increasingly frustrated with the

police. (RR XXXIII – 28). The family began their own investigation, interviewing and recording a number of people, and in fact interfering with and possibly tainting the police investigation. (RR XXXIII – 28). During this time, Bowers' wife, Shianese Iglehart, had a run-in with Keenan Hubert. (RR XXXIII – 31). Bowers' family produced a list of who they believed was involved, including Keenan Hubert, which they provided to Detective Alston. (RR XXXIII – 32-33). Alston's investigation could find no evidence that Hubert was actually involved with Bowers' killing. (RR XXXIII – 33). As time passed, tensions began to rise in the community. (RR XXXII – 100). About a month after Bowers was murdered, there was a confrontation between Rickey Cummings and Hubert at a park in Waco. (RR XXXIII – 220-225). Meanwhile, in early March, 2011, Appellant had attempted to make a straw purchase of an AK-47 rifle with a folding stock, at a gun store in Waco. (RR XXXVII – 84, 89, 107).

At about 3:00 p.m. on the date of the Sneed and Hubert murders, Chantal Hart and another woman came in contact with Rickey Cummings, and observed an AK-47 with a folding stock in the back seat of Cummings' car. (RR XXXVII – 119-122). Their picture was taken with the gun. (RR XXXVII – 123). Appellant's phone records showed that later that afternoon he was driving around Waco with Rickey and D'Arvis Cummings, eventually going to the Lakewood Villas Apartments that evening. (RR XXXVI – 82-85).

Keenan Hubert also went to the apartment complex that evening, to visit a friend, Marion Bible.  (RR XXXIII – 169-170).  Hubert and Bible also met up with a common friend, Deontrae Majors.  (RR XXXIII – 169-170).  After these three men met up, they had a heated encounter with Rickey Cummings.  (RR XXXIII – 233-234).  After this event, Hubert, Bible and Majors sat in Majors' car.  (RR XXXIII – 236).  They were shortly joined by another common friend, Tyus Sneed.  (RR XXXIII – 237).  The four sat in the car, watching videos and smoking marihuana.  (RR XXXIII – 236-237).

After the run-in with Hubert, Bible and Majors, Cummings nearly got hit by a car in the complex parking lot.  (RR XXXV – 96-97).  Cummings threatened to shoot the driver.  (RR XXXV – 97).  Darnell Atkins tried to calm Cummings down, inviting him to his apartment to smoke marihuana.  (RR XXXV – 98-99).  During this visit, Cummings got a phone call from Appellant and immediately left Atkins' apartment.  (RR XXXV – 99-100).

A short time later Tyus Sneed's father, Robert Sneed, encountered Rickey Cummings.  (RR XXXIII – 194).  Robert Sneed knew Rickey Cummings personally and the two exchanged a brief greeting.  (RR XXXIII – 195).  Cummings was accompanied by two other men.  (RR XXXIII – 197).  Briefly thereafter, Cherrelle Dye saw a group of men in the area, one carrying a long gun.  (RR XXXV – 118).

About thirty to forty-five minutes later, a number of people at the apartment complex heard heavy, sustained gunfire coming from the parking lot area.  (RR XXXIII – 239-240).  At approximately 11:20 p.m., four

men rushed Majors' car from behind, shooting at the car and its occupants with a .45-caliber pistol, a .38-caliber revolver, a .40-caliber pistol, and an AK-47-style rifle. (RR XXXIV – 89). The back window was shot out immediately. (RR XXXIII – 239). Majors and Bible were in the front seat, and though wounded, were able to escape to Bible's apartment. (RR XXXIII – 241-243). Sneed and Hubert, sitting in the back seat, were both shot eight times. (RR XXXV – 15, 32). The vehicle itself was riddled with bullet holes, and the windows were blown out. (RR XXXIII – 87). None of the occupants of the car had been armed. (RR XXXIII – 238-239).

Two of the attackers then fled in the direction they came from. (RR XXXV – 159-163). One of these attackers, Appellant, was described by a witness as being heavier-built and carrying an AK-47-type rifle. (RR XXXV – 162). The third assailant, Rickey Cummings, chased Bible and Majors into Bible's apartment. (RR XXXV – 196-200). Nikoll Henry, who also lived at the apartment, came face-to-face with Cummings at the front door of the apartment. (RR XXXV – 200). Cummings was carrying a .45-caliber pistol, which had jammed. (RR XXXV – 201). Cummings was trying to clear the weapon and wound up ejecting a round which was later found inside the apartment. (RR XXXIV – 175). Cummings then left the scene. (RR XXXV – 205).

A few minutes after the shooting stopped, Brittany Snell, another of the apartment complex residents, saw Appellant and Rickey Cummings. (RR XXXVI – 205). They went to Snell's apartment and Cummings asked to

borrow Snell's phone.  (RR XXXVI – 205).  She let the two into her apartment, not questioning why Cummings didn't go to his grandmother's apartment to use her phone.  (RR XXXVI – 209).  Before making a call, Cummings went into the bathroom, apparently washing his hands.  (RR XXXVI – 216).  Cummings then tried to call his brother, D'Arvis.  (RR XXXVI – 212).  However, Rickey could not speak with D'Arvis at this time as D'Arvis had just been stopped by the police.  (RR XXXIV – 195).  Cummings and Appellant then left the apartment complex.  (RR XXXVI – 213).

For the next three hours, Appellant had his phone turned off.  (RR XXXVI – 99).  His next call was to Bowers' mother, then a text to Shelia Bowers saying, "We love you."  (RR XXXVI – 107, 118).  Then Appellant texted to Rickey Cummings, "T-Bucks!" Bowers' nickname.  (RR XXXVI119).  Later Appellant texted his wife, concluding the text stream by telling her to delete his messages.  (RR XXXVI – 121).  The day after the murders, Appellant texted his wife to "Take them bullets out of the house."  (RR XXXVII – 74).

After the shootings, Appellant went into hiding in McGregor, Texas.  (RR XXXVI – 145).  During this time, Appellant had text conversations with his uncle in Killeen, Darryl Haynes, regarding acquisition and disposal of guns.  (RR XXXVI – 145).  Appellant specifically asked Haynes to get him a .40-caliber pistol.  (RR XXXVI – 133).  In discussing disposal of the murder

weapons, Appellant advised Haynes that he had already taken care of the matter. (RR XXXVI – 145).

On April 1, 2011, Rickey Cummings was arrested. (RR XXXIV – 281). During the arrest of Cummings, it was discovered that he had a .40-caliber pistol on his person. (XXXIV – 284). Also, .45-caliber and .38-caliber ammunition was found in Cummings' vehicle. (RR XXXIV – 287).

On April 5, 2011, Appellant was also arrested. (RR XXXIV – 301). Among the text messages Appellant wrote after the killings and prior to his arrest was a statement that he "did it ugly and messy. Man-Man had a blast when he seen that." (RR XXXVI – 159). Also during this time, Appellant got a tattoo which featured Bowers' likeness along with the words, "RIP Man-Man," and the image of an AK-47 rifle. (RR XXXV – 262-263).

The State obtained and presented in evidence cell phone records showing Appellant's approximate locations, calls sent and received, and texts sent and received during the times relevant to the case. (RR XXXVI – 36-175).

The jury returned its verdict of guilt. (RR XXXVIII – 53).

At punishment, evidence was presented that Appellant had attended Prairie View A&M, where he was involved in drinking, marihuana and partying. He also admitted to being involved in robberies and shootings during this time. (RR XL – 83-87).

While at college, Appellant developed a brain infection which required surgeries. (RR XLII – 42-70). Evidence was presented indicating that Appellant had cognitive deficits as a result of the medical issues. (RR XLII – 85-103). In rebuttal, the State presented letters and drawings Appellant had made, indicating retention of mental faculties and fine motor skills. (RR XLII – 103-147).

Evidence was also presented regarding Appellant's gang membership, including the wearing of red clothing, gang-related tattoos, and appearing in a music video which included gang references. (RR XL – 158; XLI – 70-75).

Upon the jury's findings on the special issues, Appellant was sentenced to death. (RR XLII – 209).

**POINT OF ERROR 1:  Did the trial court err in improperly granting two (sic) of the State's challenges for cause?**

## Statement of Facts

The questioning of venireperson Deanna Shanklin regarding the State's burden of proof transpired, in relevant part, as follows:

Q. (by the State) … I think in one of your answers you said that you strongly agreed that the State should be required to prove a defendant's guilt beyond all doubt, even though the law only requires that it be proved beyond a reasonable doubt.

A. If it's this severe, a death, you know, definitely. … (RR XX – 53)

Q. … So that I understand, in order for you to ever find this man guilty in this particular case, you're going to have to be – the case is going to have to be proven to the point where you are 100 percent certain of his guilt before you're ever going to find him guilty of capital murder and move him toward a death penalty.  Right?

A. Yes, sir.

Q. And you sound pretty certain about that.

A. Yes, sir. … (RR XX – 54)

Q. … Would you be able to make that determination?  Do you feel that you would ever have enough evidence where you would be 100 percent certain about how to answer that question either yes or no, because some people have said, "I just don't think that that question is capable of being answered to that degree of certainty that is required by law" ?

A. I think it boils down to the evidence and what is found and how I feel in my mind.  If there is enough evidence, anybody can make a certain decision. … (RR XX – 64)

Q. … I want to come back to one last thing for you and just make sure that I understand, and that is, one of the things that you've told me is this:  Any decision that you make in this case, whether it be this man's guilt, whether it be the answers to Question 1 or Number 2

where we have the burden of proof, before you're ever going to answer those questions and side with the State of Texas, you're going to have to be 100 percent certain before you do that, aren't you.

A. Yes, sir. … (RR XX – 76)

Q. (by Appellant) … You kind of believe – do not believe that the death penalty should be imposed, but as long as the law provides for it, you could assess it under the proper circumstances. Is that basically what you're telling us?

A. Yes, sir. If I can believe in my heart and my soul beyond a reasonable doubt or 100 percent, then I could do that. … (RR XX – 84-85)

Q. (by the State) … You told me as plain as day several times that before you ever find this man guilty of capital murder, you're going to have to be 100 percent certain –

A. Yes, sir.

Q. – of his guilt, aren't you?

A. Yes, sir.

Q. There is no way – are you ever going to be able to find this man guilty of capital murder if you have any doubt whatsoever of his guilt?

A. No. … (RR XX – 92-93)

Q. (by Appellant) … I guess you'd want to be convinced beyond all reasonable doubt?

A. Yes.

Q. You could follow the law?

A. Yes.

MR. DONAHUE: No further questions, Judge.

VENIREPERSON SHANKLIN: Beyond a reasonable doubt, I can be 100 percent, yes.

THE COURT: Ma'am, for my benefit, I need to clarify. I need for you to clarify something for me. You have said several times – and you're probably tired of saying it – that you want to be convinced beyond all doubt, that you want to be 100 percent certain of any decision you have to make in this case.

10

VENIREPERSON SHANKLIN: Yes, sir.

THE COURT: The State has the burden of proving this case beyond a reasonable doubt.

VENIREPERSON SHANKLIN: Yes, sir.

THE COURT: 100 percent certainty is different than proof beyond a reasonable doubt. They are two different things. They are not the same thing.

VENIREPERSON SHANKLIN: I beg to differ.

THE COURT: No, ma'am.

VENIREPERSON SHANKLIN: I think that if they show me the evidence –

THE COURT: You're certainly free to believe anything you want to, ma'am. I'm not arguing with you. I'm just telling you that the law says they are two different things.

VENIREPERSON SHANKLIN: Okay. …

THE COURT: Okay. I just want to make sure you understand, there is a distinction. 100 percent certainty is a higher standard than proof beyond a reasonable doubt. It's two different things under the law.

VENIREPERSON SHANKLIN: Okay.

THE COURT: Do you understand that?

VENIREPERSON SHANKLIN: Yes, sir.

THE COURT: Okay. What standard are you going to apply in this case regarding the State's having the burden in this case? What level are you going to require them to prove their case, 100 percent certainty or proof beyond a reasonable doubt?

VENIREPERSON SHANKLIN: It's going to have to be beyond a reasonable doubt if I can't be 100 percent certain, because I wasn't at the crime.

THE COURT: Do you understand the distinction?

VENIREPERSON SHANKLIN: Yes, sir. …

THE COURT: So what level of certainty would you require the State to prove their case to?

VENIREPERSON SHANKLIN: Beyond a reasonable doubt. If I have any doubt, then I'm not – I'm honest.

THE COURT: I know you are, ma'am. No one is questioning your integrity or honesty, and we appreciate that.

VENIREPERSON SHANKLIN: I would never do anything if I had a doubt that something else could have come in. I could not do that. (RR XX – 94-97).

The court granted the State's challenge for cause, explaining, "That's the reason I asked her those questions. Until her last comment to me about if she has got any doubt at all, she cannot have a doubt, I would have – I wouldn't have granted the challenge, but based on what she said, the totality of her comments, I'm going to grant the challenge." (RR XX – 98).

## Argument

A party may challenge a venireperson for cause whenever he or she has a bias or prejudice against any phase of the law applicable to the case upon which the party is entitled to rely. *Cardenas v. State*, 325 S.W. 3d 179, 184-185 (Tex. Crim. App. 2010). The test in such circumstances is whether the bias or prejudice would prevent or substantially impair the venireperson's ability to fully follow the law as set out in the trial court's instructions and as required by the juror's oath. *Swearingen v. State*, 101 S.W. 3d 89, 99 (Tex. Crim. App. 2003); *Feldman v. State*, 71 S.W. 3d 738, 744 (Tex. Crim. App. 2002). The law pertaining to the application of the proper burden of proof is a law upon which the State is entitled to rely. *Tex. Code Crim. Proc. art. 35.16(b)(3)*. The State is entitled to jurors who will apply the proper burden of proof. *Cardenas* at 184. Once a venireperson admits a

12

bias against a phase of the law upon which a party is entitled to rely, a sufficient foundation has been laid to support a challenge for cause. *Cumbo v. State*, 760 S.W. 2d 251, 255-256 (Tex. Crim. App. 1988). Before a prospective juror can be challenged for cause, however, the law must be explained to him and he must be asked whether he can follow that law regardless of his personal views. *Feldman* at 744; *Jones v. State*, 982 S.W. 2d 386, 390 (Tex. Crim. App. 1998) *cert. denied*, 528 U.S. 985, 145 L. Ed. 2d 362, 120 S. Ct. 444 (1999).

Appellate review of a trial court's decision to grant or deny a challenge for cause is deferential to the trial court due to its superior position in evaluating a venireperson's demeanor and responses, as well as the context and tone in which questions were asked and answered. *See, Rachal v. State*, 917 S.W. 2d 799, 810 (Tex. Crim. App. 1996). Likewise, when a venireperson's answers are vacillating, unclear, or even contradictory, great deference is afforded to the trial court, because it has the better opportunity to see and hear the venireperson. *Swearingen* at 99. Accordingly, a trial court's ruling on a challenge for cause will be reversed only if a clear abuse of discretion is evident, which occurs when the decision falls outside the zone of reasonable disagreement. *Gardner v. State*, 306 S.W. 3d 274, 296 (Tex. Crim. App. 2009); *Russeau v. State*, 171 S.W. 3d 871, 879 (Tex. Crim. App. 2005). The appellate court reviews the entire voir dire record to determine whether there is sufficient evidence to support the ruling. *Feldman* at 744.

In the case at bar, Venireperson Shanklin repeatedly told the State's attorney that she would have to be convinced "100 percent." When she was asked by Appellant if she could assess punishment "as the law provides for it, you could assess it under the proper circumstances," Shanklin replied that, "If I can believe in my heart and my soul beyond a reasonable doubt or 100 percent, then I could do that." The court then explained to Shanklin that "100 percent certainty is different than proof beyond a reasonable doubt." Shanklin begged to differ. The court continued to explain the law to Ms. Shanklin, then asked her what standard she was going to apply in the case, "100 percent certainty or proof beyond a reasonable doubt?" Ms. Shanklin tried to answer the court three times, stating, "It's going to have to be beyond a reasonable doubt if I can't be 100 percent certain," "Beyond a reasonable doubt. If I have any doubt, then I'm not – I'm honest," and "I would never do anything if I had a doubt that something else could have come in. I could not do that."

The record clearly provides an ample basis to support the trial court's grant of the State's motion to strike Ms. Shanklin. Her initial answers to the State's questioning indicated she would hold the State to a "100 percent" burden. Appellant's attempts at remediation drew a response of "Beyond a reasonable doubt, I can be 100 percent, yes." The trial judge's explanation of the burden of proof spurred Ms. Shanklin to argue the point. Ms. Shanklin's final word on the matter was, "I would never do anything if I had a doubt that something else could have come in. I could

not do that." This was and equivocating venireperson. It cannot be shown that the court's ruling on the State's motion to strike Ms. Shanklin fell outside the zone of reasonable disagreement. The Appellant's point of error should be denied.

**POINT OF ERROR 2: Did the trial court err in denying Appellant's *Batson* challenge to the State's peremptory strike of an African-American venireperson?**

### Statement of Facts

Venireperson Lewis Wright was the sole African-American on the panel who was the subject of a State's peremptory strike. (RR XXX – 144). Asked by the State about his thought on the burden of proof beyond a reasonable doubt, Mr. Wright responded, "That's a tough question." (RR XXX – 113). He also opined that, "The ultimate result, if it ended up being a sentence of a death sentence, I can't say I personally agree with that. (RR XXX – 115). Mr. Wright expanded on this thought, saying "to think that you would be part of a decision making process that would put you in a position to choose whether another human being is worthy of existing or not, and as a deeply spiritual and religious man, that's tough." (RR XXX – 119). Mr. Wright held the belief that the "economics of an individual could possibly play a part in the outcome of a case." (RR XXX – 132).

Appellant made a *Batson* challenge to the peremptory strike, asking the court to "require the State to provide some sort of race-neutral reason on this issue. (RR XXX – 144-145). *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct.

15

1712, 90 L. Ed. 2d 69 (1986).  The State replied that "the defense cannot make a prima facie case of discrimination on this case."  (RR XXX – 145).  Appellant responded that Mr. Wright had "not provided any particular answer that would be any different than, obviously, the majority of white jurors in this case."  (RR XXX – 145).  The State pointed out that it had used seven peremptory strikes, all on white veniremen, to which Appellant responded that Mr. Wright was the first African-American venireperson who had yet qualified to serve on the jury.  (RR XXX – 145-146).  The court asked if Appellant was trying to make a prima facie case "simply because he's black.  That's basically what you're telling me is that because he's black, then it follows that the State is striking him because of his race."  (RR XXX – 146).  Appellant responded that "it appears that way, simply because, as we've said, I mean, he's the first black juror that we've been able to qualify…. and I can't show a pattern, in large part, just because it's the first qualified juror we've had."  (RR XXX – 147-147).  The court ruled that Appellant had not made out a prima facie case of purposeful discrimination.  (RR XXX – 147).

The State was then allowed to put on record its race-neutral reasons for striking Mr. Wright.  These included Mr. Wright's questionnaire responses regarding his views on the death penalty and the quality of representation for the wealthy as opposed to that for the poor.  (RR XXX – 148-149).  The State's counsel also was concerned about Mr. Wright's hesitancy on certain issues, including the burden of proof and Mr. Wright's

16

ability as a spiritual and religious man to convict and potentially impose a death sentence. (RR XXX – 149-152). The court stated that, had it found a prima facie case, it would also have found the State's rationale for the strike to be race-neutral. (RR XXX- 152-153).

### Argument

A reviewing court may overturn a trial court's ruling on a *Batson* challenge only if the ruling was clearly erroneous. *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008); *Young v. State*, 283 S.W. 3d 854, 966 (Tex. Crim. App. 2009) *cert. denied*, 558 U.S. 1093, 130 S. Ct. 1015, 175 L. Ed. 2d 622 (2009). This highly deferential standard is used because of the trial court's unique position to make determinations regarding the prosecutor's credibility and demeanor, as well as the demeanor of the prospective jurors. *Snyder*, 552 U.S. at 477; *Gibson v. State*, 144 S.W. 3d 530, 534 (Tex. Crim. App. 2004). A ruling is clearly erroneous if it leaves the reviewing court with the definite and firm conviction that a mistake has been committed. *Guzman v. State*, 85 S.W. 3d 242, 254 (Tex. Crim. App. 2002; *United States v. Fernandez*, 887 F. 2d 564, 567 (5th Cir. 1989). Appellate review of the record of the voir dire and *Batson* hearing is done in the light most favorable to the trial court's ruling. *Young* at 866.

Striking a prospective juror on the basis of race violates constitutional guarantees of equal protection. *U.S. Const. amend. XIV*; *Batson*, 476 U.S. at 89; *Tex. Code Crim. Proc.* art. 35.261. Resolution of a *Batson* challenge potentially involves a three-step process. *Snyder* 552 U.S. at 476. The first

step in that process requires that the defendant make a prima facie case showing that the State exercised a peremptory strike in a discriminatory manner. *Id.*; *Young* at 866. The State is not required to give a race-neutral reason for a challenged strike unless the defendant first establishes a prima facie case of discrimination. *Rousseau v. State*, 824 S.W. 2d 579, 581 (Tex. Crim. App. 1992).

The initial burden of establishing a prima facie case is not onerous. *Id.* at 584. The defendant must show that he is a member of a cognizable racial group, that the State exercised peremptory strikes to remove venirepersons based on their race, and the defendant has offered evidence of relevant facts that tend to show challenges made by the State were for reasons based on race. *Tex. Code Crim. Proc.* art. 35.261(a); *Rousseau* at 584. Although the racially discriminatory striking of even one minority venireperson will violate *Batson*, the defendant must prove discrimination by more than the mere fact that a minority venireperson was struck by a peremptory challenge. *United States v. Branch*, 989 F. 2d 752, 755 (5th Cir. 1993). If this is the only evidence proffered by the defendant, a prima facie case does not arise. *Id.* The trial court is not required to ask for and evaluate the prosecutor's grounds for exercising peremptory strikes unless and until a prima facie case of discrimination has been made. *Id.*

In the case at bar, Appellant's only argument was that a peremptory strike had been made simply because Mr. Wright was the only African-American venireperson who had yet qualified for the jury. A nonexclusive

list of factors that might give rise to a prima facie case of discrimination includes a "pattern" of strikes, the nature of questions asked by the prosecutor on voir dire, and the prosecutor's statements during voir dire. *Batson*, 476 U.S. at 96-97; *Branch* at 755; *Keeton v. State*, 749 S.W. 2d 861, 867 (Tex. Crim. App. 1988). Appellant offered only that Mr. Wright had "not provided any particular answer that would be any different than, obviously, the majority of white jurors in this case." Appellant did not offer to expand this point to demonstrate that the nature of the questions and statements by the State indicated any discriminatory intent. The trial judge was able to hear the voir dire, including the colloquy concerning Mr. Wright's equivocation on burden of proof and assessment of punishment, as well as his concerns stemming from his spiritual and religious convictions.

Appellant has not shown that the trial court's ruling was clearly erroneous under the deferential standard enunciated in *Snyder*, and this point of error should be denied.

**POINT OF ERROR 3: Did the trial court err in allowing the admission of an extraneous bad act?**

**Statement of Facts**

Marion Bible, one of the shooting victims, testified that he knew Appellant and the Cummings brothers. (RR XXXIII – 217-218). Bible recounted a run-in between Keenan Hubert and Rickey Cummings at a

Waco park in May of 2010. (RR XXXIII – 223). Rickey Cummings was accompanied by his brother D'Arvis and Appellant. (RR XXXIII – 222). When Bible started to testify to the exchange of words, Appellant's hearsay objection was sustained. (RR XXXIII – 223). Bible also testified to another run-in between Hubert and Rickey Cummings on the night of the murders. (RR XXXIII – 234). The State's question whether words were exchanged drew a hearsay objection, upon which the court admonished Bible not to say anything anyone had told him. (RR XXXIII – 234-235). Later Bible was asked if he had reported to a police investigator what he had heard about an AK-47 having been purchased by Appellant's girlfriend. (RR XXXIII – 246). The State responded to the hearsay objection, explaining the question was directed to what Bible himself had told the investigator. (RR XXXIII – 247). The objection was overruled. (RR XXXIII – 247).

Prior to cross-examination, outside the presence of the jury, the attorneys argued the admissibility of Hubert's statements to co-defendant Rickey Cummings on the night of the murders. (RR XXXIII – 249-253). The State argued that the statement consisted of song lyrics that Hubert directed toward Cummings, intended as a taunt. (RR XXXIII – 250). As such, the statement was not being offered for the truth of the matter asserted. (RR XXXIII – 250-251). Rather, it went to the prior relationship between the victim Hubert and the co-defendant Rickey Cummings, and further explained the intent and motive of the co-defendant. (RR XXXIII – 251-252). The court overruled the Appellant's hearsay and relevance

20

objections. (RR XXXIII – 252-253). On redirect, Bible was asked what Hubert had told Rickey Cummings the night of the murders, to which Appellant reiterated his objection. (RR XXXIII – 267-268). The objection being overruled, Bible related the song lyrics that Hubert had taunted Cummings with, "I know you're strapped but you cowards like to play hard, but knowing that, you don't want to catch the murder charge. (RR XXXIII – 268).

The State then asked Bible if he had ever seen Appellant in possession of firearms prior to the night of the murders. (RR XXXIII – 269). Appellant's counsel approached and a bench conference was held outside the presence of the jury. (RR XXXIII – 269-270). During the conference, the State advised that the expected testimony would show that Appellant had, on separate occasions, been in possession of .38-caliber, .40-caliber, and .45-caliber firearms. (RR XXXIII – 271). The testimony was being offered to show that Appellant had been in recent possession of firearms having the same calibers as those used in the murders. (RR XXXIII – 276). Appellant objected on the bases that the State had not provided notice of these matters as prior bad acts; that the same testimony as offered at the trial of Rickey Cummings indicated that the events had transpired a month or two before the murders, thus rendering them too remote; that the testimony went beyond the scope of redirect examination; that the evidence was not relevant; and if relevant, that the probative value of the evidence was outweighed by its prejudicial effect. (RR XXXIII – 272-273). The State

argued that the events did not indicate prior bad acts requiring notice, as no evidence would be adduced showing that Appellant's possession of the firearms was illegal due to his status as a convicted felon. (RR XXXIII – 272). The court overruled the objections, finding that the testimony did not concern prior bad acts, that a balancing test was therefore not required, and that if such a test was required that the evidence was more probative than prejudicial. (RR XXXIII – 274, 277). Mr. Bible was then allowed to testify to the three occasions when he had seen Appellant with the different kinds of guns. (RR XXXIII – 278-284). The three events had happened within the year between Bowers' murder and the murders of Hubert and Sneed, one of them happening within a month or two of the Hubert and Sneed murders. (RR XXXIII – 279, 283).

During the redirect examination of Nickoll Henry, she was asked about an event about two weeks before the murders when she saw Appellant carrying a weapon. (RR XXXV – 221-222). At the ensuing bench conference, the State proffered that the testimony would show that on the occasion, Appellant and Rickey Cummings had had a confrontation with a third party, and both Appellant and Cummings had been carrying pistols. (RR XXXV – 222-223). Appellant advised that no notice of this had been provided, to which the State responded that the defense had been given a notice via email. (RR XXXV – 223-224). Appellant then specified his objections that the evidence was an extraneous matter being used to show conformity with the character traits of violence and carrying weapons,

22

relevance, and prejudicial effect outweighing probative value. (RR XXXV – 224). The State argued that cross-examination of prior law enforcement witnesses had revealed a defense theory that Appellant had not had the opportunity to possess the weapons used in the murders. (RR XXXV – 224-225). After hearing argument of counsel, the court ruled that the evidence was relevant and that its probative value outweighed its prejudicial effect. (RR XXXV – 228). Ms. Henry then testified that, about two weeks before the murders, she had witnessed an incident wherein a group including Appellant and Rickey Cummings had approached a man identified as Carlos Smith. (RR XXXV – 229). Appellant and Cummings had been armed with handguns. (RR XXXV – 231). Ms. Henry recalled the incident because her young son had been present. (RR XXXV – 231).

### Argument

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. *Tex. R. Evid.* 404(b). Texas Rule of Evidence 403 provides that even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Tex. R. Evid.* 401. However, Rule 404(b) also provides that extraneous offense evidence may be admissible for other purposes. *Johnson v. State*, 145 S.W.3d 215, 219 (Tex.

23

Crim. App. 2004). One of the purposes for which extraneous offense evidence is admissible is when a defendant raises a defensive issue that negates one of the elements of the offense. *Id.* A party may introduce evidence of other crimes, wrongs, or acts if such evidence logically serves to make more or less probable an elemental fact, an evidentiary fact that inferentially leads to an elemental fact, or defensive evidence that undermines an elemental fact. *Montgomery v. State,* 810 S.W. 2d 372, 387 (Tex. Crim. App. 1991)(opinion on rehearing). The issue of whether extraneous offense evidence has relevance apart from character conformity is a question for the trial court. *Moses v. State,* 105 S.W. 3d 622, 627 (Tex. Crim. App. 2003).

Appellant was charged with causing the deaths of the victims by shooting them with a firearm. (CR I – 10). Thus, the State was obligated to prove Appellant's use of a firearm. When a challenge is presented as to a defendant's opportunity to commit an essential element of an offense, it becomes proper to introduce extraneous offense evidence to rebut the defensive issue. *Ransom v. State,* 920 S.W. 2d 288, 301 (Tex. Crim. App. 1996). The standard of review for a trial court's ruling under the Rules of Evidence is abuse of discretion. *Sauceda v. State,* 129 S.W. 3d 116, 120 (Tex. Crim. App. 2004). The trial court's ruling will be upheld if it was correct under any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made. *Id.* Extraneous offense evidence is admissible under Rules 404(b) and 403 if a two-prong test is

satisfied: whether the extraneous offense evidence is relevant to a fact of consequence in the case apart from character conformity, and whether its probative value is not substantially outweighed by unfair prejudice. *Johnson* at 220. As long as the trial court's ruling on the issue falls within the zone of reasonable disagreement, appellate courts will uphold that ruling. *Montgomery* at 391.

In the case at bar, the State presented the testimony of Bible and Henry to rebut a defensive theory of lack of opportunity. The court found that the testimony showing Appellant's recent possession of firearms having the same characteristics as those used to murder Sneed and Hubert was relevant to rebut the defensive theory. The evidence was related to a fact of consequence apart from character conformity. The court further performed the balancing test required under Rule 403, finding that the probative value outweighed the prejudicial effect. The court's ruling did not fall outside the zone of reasonable disagreement, and Appellant's point of error should be denied.

**POINT OF ERROR 4: Did the trial court err in allowing into evidence items seized in a search of a co-defendant's vehicle?**

### Statement of Facts

The trial court held a bench conference prior to the State calling Waco Police Sergeant Steve Anderson. (RR XXXIV – 268). The State proffered that Anderson would be called to sponsor items seized upon the arrest of

co-defendant Rickey Cummings on April 1, 2011. (RR XXXIV – 269). Appellant objected to this testimony and evidence on the grounds of relevance, the prejudicial value of evidence outweighing its probative value, and not having an opportunity to confront the co-defendant as to why he might have had a gun in his vehicle when arrested. (RR XXXIV – 270-217). In response the prosecution pointed out that, since this was a party offense, the State had the right to prove the guilt of the co-defendant Rickey Cummings and Appellant's guilt as a party. (RR XXXIV – 271). Further, the State argued that the evidence was relevant on this point as other evidence would be adduced from text messages that, while Appellant was at large, he was trying to get a .40-caliber pistol. (RR XXXIV – 271). Appellant rejoined that the gun in Cummings' car was not used in the murders and therefore not relevant, that the probative value was outweighed by the prejudicial effect, and the defense did not have the right to confront and cross-examine Cummings. (RR XXXIV – 271-272). The State replied that the evidence showed that the pistol found in Cummings' car was intended for Appellant, thus making it extremely relevant to the prosecution's case. (RR XXXIV – 272). The court found that the evidence was relevant, that its probative value outweighed its prejudicial effect, and further overruled Appellant's confrontation objection. (RR XXXIV – 272-273). For the purpose of clarifying the record, the State's counsel stated that the witness would not be asked to divulge anything that Rickey Cummings said to him. (RR XXXIV – 273). Sergeant Anderson sponsored

the introduction of the items into evidence over Appellant's running objection.  (RR XXXIV – 281-282, 290).

## Argument

A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard.  *Martinez v. State,* 327 S.W. 3d 727, 736 (Tex. Crim. App. 2010).  The trial court does not abuse its discretion unless its ruling lies outside the zone of reasonable disagreement.  *Id*.; *De La Paz v. State*, 279 S.W. 3d 336, 343-344 (Tex. Crim. App. 2009).

Although admissible under Rule 404(b), evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury.  *Tex. R. Evid*. 403. When undertaking a Rule 403 analysis, the trial court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.  *Gigliobianco v. State*, 210 S.W. 3d 637, 641-42 (Tex. Crim. App. 2006).

Rule 403 favors admissibility, and the presumption is that relevant evidence will be more probative than prejudicial.  *Montgomery* at 389; *De La*

27

*Paz* at 343. As with Rule 404, a trial court does not abuse its discretion when it admits or excludes evidence pursuant to Rule 403 so long as its decision is within the zone of reasonable disagreement. *De La Paz* at 343-344.

In the case at bar, the State proffered the relevance of the items recovered on the arrest of the co-defendant. Namely, other evidence showed that Appellant and co-defendant Rickey Cummings had acted in concert, as shown by their phone and text records. Amongst these records were communications by Appellant showing his desire to obtain a .40-caliber pistol while he remained at large. Further, eyewitness accounts showed that Appellant and co-defendant Rickey Cummings had, while armed, confronted various subjects they believed were responsible for the murder of Emuel Bowers. All of these matters factored into showing motive, intent and plan regarding the commission of the Hubert and Sneed murders, and their attempts to avoid detection and apprehension after the fact. The items found in co-defendant Rickey Cummings' car, particularly the .40-caliber firearm and the various kinds of ammunition, were highly relevant to the prosecution's case. The trial court's ruling admitting these items into evidence fell within the zone of reasonable disagreement, and was not an abuse of discretion.

In support of his confrontation claim, Appellant cites to *Crawford v. Washington*, 541 U.S. 36, 57, 124 S.Ct. 1354, 158 L.Ed. 2d 177 (2004), and its progeny. These lines of cases interpret a defendant's right to confront

28

witnesses against him. *U.S. Const. amend. VI.* Without exception, these cases deal with actual witnesses and testimonial and non-testimonial statements. The issue presented by Appellant regarding a proposed right of confrontation in dealing with the admission of tangible items of evidence is without basis and presents no justiciable issue. The trial court did not abuse its discretion in admitting evidence in the face of a confrontation clause objection.

Appellant's fourth point of error is without merit and should be denied.

**POINT OF ERROR 5: Did the trial court err in admitting into evidence a hearsay statement of a co-defendant made prior to the commission of the offense and not in furtherance of a conspiracy?**

**Statement of Facts**

Prior to the testimony of Miche'al Atkins, a hearing was held outside the presence of the jury, pursuant to Appellant's motion in limine. (RR XXXV – 79). In this hearing, the State proffered that Atkins would testify that on the night of murders, he witnessed a statement by co-defendant Rickey Cummings. (RR XXXV – 80). The statement was made in the parking lot of the apartment complex when a car came close to hitting Cummings. (RR XXXV – 80). Cummings had yelled at the driver, "I would have shot that car if you hit me." (RR XXXV – 80). The State argued for admission of the statement under the excited utterance hearsay exception. (RR XXXV – 80-81). Appellant argued that the statement was inadmissible

hearsay, that its admission would deprive him of the right to confront Rickey Cummings regarding the statement, that the statement was not made as part of any conspiracy, and its prejudicial effect would outweigh any probative value. (RR XXXV – 81-82). The State responded that the statement was being offered to show co-defendant Rickey Cummings' state of mind shortly before the murders, as well as to show that Cummings was armed. (RR XXXV – 82). Confrontation did not apply, as the statement was not testimonial, and it was admissible as an excited utterance exception to the hearsay rule. (RR XXXV – 82-83). For these reasons, the State argued, the probative value outweighed its prejudicial effect. (RR XXXV – 83). The trial court asked for clarification on the facts and circumstances surrounding the statement, verifying that the incident happened around a half-hour before the murders, and that phone records would show that Cummings received a call from Appellant shortly before the murders were committed. (RR XXXV 86-87). The court overruled Appellant's objection to admitting the statement on all proposed bases. (RR XXXV – 87).

Micha'el Atkins then testified that when Cummings nearly got hit by the car, his response was, "If you hit me, I'll shoot this motherfucker up." (RR XXXV – 97-98). Atkins' father then invited Cummings to come inside the apartment to smoke marihuana. (RR XXXV – 98-99). After ten or fifteen minutes, Cummings got a phone call and left the apartment. (RR XXXV – 99).

## Argument

The state presented co-defendant Cummings' statement under the excited-utterance exception to the hearsay rule. *Tex. R. Evid.* 803(2). This exception allows the admission of an out-of-court statement relating to a startling event or condition made while the declarant is under the excitement relating to a startling event or condition made while the declarant is under the stress of excitement caused by the event or condition. *Id*.

For the excited utterance exception to apply, (1) the exciting event must be startling enough to evoke a truly spontaneous reaction from the declarant, (2) the reaction to the startling event must be quick enough to avoid the possibility of fabrication, and (3) the resulting statement should be sufficiently "related to" the startling event to ensure the reliability and trustworthiness of that statement. *McCarthy v. State*, 257 S.W. 3d 238, 241-242 (Tex. Crim. App. 2008). In the case at bar, Rickey Cummings exclaimed immediately after nearly getting hit by a car, "If you hit me, I'll shoot this motherfucker up." This situation is a near-perfect example of an excited utterance and undoubtedly related to the startling event. Cummings had just been nearly hit by a car. His statement was made immediately. He was clearly still under the excitement of the startling event. Based on these factors, the trial court could conclude that the statement qualified as an excited utterance. *See, Zuliani v. State*, 97 S.W. 3d 589, 596 (Tex. Crim. App. 2003).

Review of a trial court's determination of whether a statement is admissible under the excited-utterance exception is for abuse of discretion. *Wall v. State*, 184 S.W. 3d 730, 743 (Tex. Crim. App. 2006). The trial court did not abuse its discretion by admitting Rickey Cummings' statement under the excited-utterance exception to the hearsay rule.

Appellant also lodged an objection on the basis of the Sixth Amendment confrontation clause. The admission of a hearsay statement made by a non-testifying declarant violates the Sixth Amendment if the statement was testimonial, and the defendant lacked an opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L. Ed. 2d 177 (2004). A "testimonial" statement is inadmissible absent a showing that the declarant is presently unavailable and the defendant had a prior opportunity to cross-examine, even if the statement falls under a firmly rooted hearsay exception. *Id*. at 59-60, 68. The Supreme Court identified three types of statements which could be regarded as testimonial: ex parte in-court testimony or its functional equivalent; extrajudicial statements contained in formalized testimonial materials; and statements which were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. *Id*. at 51-52.

Although a reviewing court defers to the trial's determinations of historical fact and credibility, a determination of a constitutional legal ruling, i.e., whether a statement is testimonial or non-testimonial, is

32

reviewed de novo. *Wall v. State*, 184 S.W. 3d 730, 742 (Tex. Crim. App. 2006).

Under either the subjective determination of whether a statement constitutes an excited utterance, or the objective determination of whether an objectively reasonable declarant would perceive his statement as testimonial, it seems clear that Rickey Cummings' statement was not testimonial. *See, Id*. at 743. An exclamation made immediately after being side-swiped by a car cannot be reasonably expected by any objectively reasonable declarant to be a statement that would be available for use at a later trial.

Application of the balancing test regarding probative value versus prejudicial effect, discussed earlier, shows that the court's ruling on admissibility did not fall outside the zone of reasonable disagreement as enunciated in *Montgomery*.

The trial court did not err in admitting the statement of co-defendant Rickey Cummings as either an excited utterance or as a non-testimonial statement. Appellant's fifth point of error should be denied.

**POINT OF ERROR 6: Did the trial court err in admitting into evidence cellular telephone records in violation of Appellant's federal and state constitutional rights?**

### Statement of Facts

Appellant filed a generalized pretrial motion to suppress evidence "in violation of any provisions of the Constitution or laws of the State of Texas,

or of the Constitution or laws of the United States of America…." (CR I – 27-28). Appellant further filed a motion to suppress evidence obtained through cell phone records. (CR I – 99-102). Appellant also filed a general motion to treat all objections as being brought under both the state and federal constitutions and other applicable state and federal law. (CR I – 78-79). At the Appellant's suggestion at a pretrial hearing, a ruling on the motion to suppress cell phone records was held in abeyance until the time of trial. (RR XII –14-14).

Prior to the testimony of James Owens, a bench conference was held. (RR XXXV – 233-240). The State advised the court that Mr. Owens would be called to sponsor redacted versions of Rickey and D'Arvis Cummings' cell phone analysis reports. (RR XXXV – 233-234). Appellant objected to Rickey Cummings' cell phone report on the bases of relevance, prejudicial effect outweighing probative value, and hearsay. (RR XXXV – 238). The State responded that the actual text messages had been redacted from the report, leaving only a data sheet containing properties and indices, as well as phone books. This information included some photographic images, several of which were irrelevant and which had likewise been redacted. (RR XXXV – 238-239). Appellant objected on confrontation grounds, and reiterated the same objections to the admission of D'Arvis Cummings' phone report. (RR XXXV – 239). The court overruled the objections and admitted both phone reports. (RR XXXV – 239-240). Mr. Owens sponsored

the phone reports, which were admitted over objection.  (RR XXXV – 248, 252-253).

The State moved to introduce business records of Metro PCS related to the phones of Appellant, co-defendants D'Arvis and Rickey Cummings, and their associates Sheronica Patterson, Shelia Bowers, Shacira Love, and Brittany Snell.  (RR XXXVI – 9-10).  Appellant then requested a bench conference.  (RR XXXVI – 10).  Appellant objected to the records, contained in State's exhibits 183-189 and 252, on the bases of relevance, hearsay, and possible extraneous acts.  (RR XXXVI – 11-12).

The State responded that State's Exhibit 183 simply showed cell tower locations.  (RR XXXVI – 12).  State's Exhibit 184 contained Appellant's cell phone information including text messages.  (RR XXXVI – 13).  The messages sent by Appellant were not hearsay and were relevant, while the messages received by Appellant were admissible to show the context of Appellant's messages used in the course of text conversations.  (RR XXXVI – 13).   The records relating to the Cummings brothers were those of co-defendants, and contained subscriber information and records of calls sent and received but did not include text messages.  (RR XXXVI – 14-15). Records relating to Sheronica Patterson, Takelia Patterson, Shelia Bowers, Shacira Love and Brittany Snell were directly tied to communications each of them had with one or more of the co-defendants, the relevance of which would be demonstrated with additional witness testimony.  (RR XXXV – 15-19).

Appellant responded that Sheronica Patterson's phone records contained hearsay text messages with other parties, which were also redundant of Appellant's phone records. (RR XXXVI – 19-20). The State responded that these records indicated use of electronic signatures that would differentiate use of the phone by Patterson and use by Takelia Patterson, Appellant's wife, thus being relevant to show the identity of the person communicating with Appellant.

Appellant protested that direct testimony from Sheronica Patterson would obviate the need for her phone records, that the entirety of the proffered records was more prejudicial than probative, and that the records should not be admissible since they were obtained without a warrant. (RR XXXVI – 21-22). The court overruled the objections, and the State clarified that, although the records had not been obtained through warrant, they were obtained by court order. (RR XXXVI – 22). The Metro PCS records were presented through the testimony of Ken LeCesne. (RR XXXVI – 6-175).

### Argument

To preserve error for appeal, a party must present a timely and specific objection. *Tex. R. App. P.* 33.1 Complaint on appeal must comport with the objection at trial. *Wilson v. State*, 71 S.W. 3d 346, 349 (Tex. Crim. App. 2002). Prior to Owens' and LeCesne's testimony, Appellant objected to admission of the cell phone and text message records generally on the bases of relevance, prejudicial effect outweighing probative value, and

hearsay.  (RR XXXV – 238). Appellant objected to the records, contained in State's exhibits 183-189 and 252, on the bases of relevance, hearsay, and possible extraneous acts.  (RR XXXVI – 11-12).  Appellant further contended that the records should not be admissible since they were obtained without a warrant.  (RR XXXVI – 21-22).  While Appellant was granted running objections to Owens' and LeCesne's testimony, no specific objections made to any of the specific statements which were introduced through their testimony.  While a running objection is generally sufficient to preserve error, any objection must be sufficiently specific for the court to make its ruling.  Appellant's running objection was as to admissibility of the phone records and text conversations generally.  Since no specific objections were lodged in regard to specific statements contained in the records as they were offered, error has not been preserved as to the admissibility of specific statements.  In other words, the trial court was not afforded an opportunity to rule on whether any particular statement was objectionable under one or more of the omnibus objections to admissibility of the records, generally; i.e., relevance, hearsay, or extraneous acts.

When reviewing a trial court's ruling on a motion to suppress, the evidence must be viewed in the light most favorable to the trial court's ruling. *Wiede v. State*, 214 S.W. 3d 17, 24 (Tex. Crim. App. 2007); *State v. Kelly*, 204 S.W. 3d 808, 818 (Tex. Crim. App. 2006).  When the record is silent on the reasons for the trial court's ruling, the reviewing court implies the necessary fact findings that would support the trial court's ruling if the

evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W. 3d 236, 241 (Tex. Crim. App. 2008). The appellate court then reviews the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly* at 819. The trial court's ruling must be upheld if it is supported by the record and correct under any theory of law applicable to the case, even if the trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W. 3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W. 3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974, 124 S.Ct. 1883, 158 L.Ed. 2d 469 (2004). Tangential to this point is Appellant's assertion that the State waived its opposition to Appellant's relevancy argument at trial, because "A conclusory statement unsupported by argument or authority is considered waived." (Appellant's Brief at 53). This rule applies to appellate proceedings, not to trial rulings. *Tex. R. App. P.* 38.1(h); *Tong v. State*, 25 S.W. 3d 707, 710 (Tex. Crim. App. 2000). The State did not waive any bases for the court's ruling, which can be presumed and upheld under any theory of admissibility applicable to the case and which is supported by the record.

Appellant objected to admission of the records on the basis of relevance. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Tex. R. Evid.* 401. The cell phone records of Appellant, his co-

defendants, and his close associates on the night of the murders showed their location, who they were in communication with, their plan, their motive and intent. Such records after the event showed their attempts to avoid detection and apprehension, their attempts to get rid of evidence, and their consciousness of guilt. Their cell phone and text message records were relevant.

The statements of Appellant and his co-defendants were not hearsay, but rather admissions of party opponents. *Tex. R. Evid.* 801(e)(2). The statements of third parties were not hearsay, as they were not offered for the truth of the matters asserted. *Tex. R. Evid.* 801(d). Rather, as pointed out by the State at trial, these statements were used to show the context of the text conversations in which the accused made admissions. The statements being relevant, their probativeness outweighed their prejudicial effect.

Appellant further objected that admission of the records and statements contained therein violated his right of confrontation under *Crawford*. As previously noted, *Crawford* applies only to testimonial statements. The text messages were not made under such circumstances to make them testimonial. Further, there has been no showing that the declarants Sheronica Patterson, Shacira Love, or Shelia Bowers were unavailable. In fact, Sheronica Patterson was actually present and sworn as a witness, but did not take the stand.

Finally, Appellant has argued that the records were obtained in violation of the Stored Communications Act. *18 USCA §2703(d)*. It has been stipulated by Appellant that the State obtained the subject records through a subpeona. (RR V – 8). The State clarified that, although the records had not been obtained through warrant, they were obtained by court order. (RR XXXVI – 22).

Law enforcement can compel providers to give them information regarding cell phone records by obtaining a valid warrant, by obtaining a court order showing "specific and articulable facts showing reasonable grounds to believe the records are relevant and material to an ongoing investigation, by consent of the subscriber, or by obtaining an administrative subpoena. *18 USCA §2703(c), (d)*. Appellant relies on the recent Supreme Court case of *Riley v. California*, ___ U.S. ___, 2014 WL 2864483 (2014). This case dealt with placement of a GPS tracking device on a subject's car. While concurrences in that case contained dicta in regard to cell phone records, the holding did not deal with cell phone records, the issue before this Court.

If error was admitted regarding the text messages or cell phone records, the error was harmless. The improper admission of evidence is a non-constitutional error that an appellate court disregards unless the error affected an appellant's substantial rights. *Tex. R. App. P.* 44.2(b); *Garcia v. State*, 126 S.W. 3d 921, 927 (Tex. Crim. App. 2004). A substantial right is affected when the error had a substantial and injurious effect or influence

in determining the jury's verdict. *Id*. An error does not affect a substantial right if there is a fair assurance that the error did not influence the jury, or had but a slight effect. *Johnson v. State*, 967 S.W. 2d 410, 417 (Tex. Crim. App. 1998). Appellant's sixth point of error is without merit and should be denied.

**POINT OF ERROR 7: Did the trial court err in admitting into evidence a compelled statement of Appellant?**

**POINT OF ERROR 8: Were Appellant's state and federal due process rights violated because the trial court allowed the jury to consider an admission by Appellant, without corroboration?**

### Statement of Facts

Through Monica Harper, Appellant's probation officer, the State presented during punishment a life history the Appellant wrote to fulfill a probation assignment. (RR XL – 83-87). In this life history, Appellant related numerous incidents of his drug and alcohol abuse, fighting, drug dealing, shootings and robberies. (RR XL – 83-87).

Prior to Ms. Harper's testimony, the court ruled on the statement's admissibility at a bench conference. (RR XL – 59-62). Appellant argued that the making of the statement, it being required as a condition of probation, was compelled. (RR XL – 59). Appellant also objected that the statement included accounts of bad acts which were uncorroborated. (RR XL – 59-60). The State responded that the statement was not the product of

41

custodial interrogation. Further, the State was not trying to prove that Appellant committed the acts he claimed in the statement, but rather the Appellant's adoption of the statement as his life history. (RR XL – 60-61). The Court overruled the objections, but advised that the standard extraneous offense instruction would be given. (RR XL – 62).

**Argument**

Code of Criminal Procedure Article 37.071 §2(a)(1) provides that evidence may be presented by the State and the defendant as to any matter that the court deems relevant to sentence, including evidence of the defendant's background or character or the circumstances of the offense that mitigates against the imposition of the death penalty. Appellant argues that the life history statement he provided to his probation officer was compelled under the "classic penalty" scenario. As such, he contends, the giving of this statement falls outside the requirements of Code of Criminal Procedure Article 38.22, regarding the admissibility of statements by an accused.

The critical inquiry is whether the State went beyond merely requiring Appellant, as a probationer, to address matters relevant to his probationary status or whether it went further and required him to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent. *Chapman v. State*, 115 S.W.3d 1, 16-17 (Tex. Crim. App. 2003). In the case at bar, the contents of Appellant's life history statement was fully within his discretion. In this case as in *Chapman*, the State did not

overtly or impliedly demand that Appellant confess all his previous crimes or be punished. *Chapman* at 22. The trial court therefore did not err in admitting Appellant's life history statement.

Appellant's life history statement was not intended to be evidence of his commission of prior bad acts. As the prosecutor pointed out, this was punishment evidence having a bearing on the issues of mitigation and future dangerousness. In making the statement, Appellant was relating his image of who he was and the way he perceived himself – issues highly relevant to a capital punishment determination. The court allowed the admission on this basis, and for good measure provided a prophylactic extraneous offense instruction.

If the certain specific references Appellant made in the statement are considered evidence of extraneous offenses, there is no requirement that the State corroborate them. The determination of whether an extraneous offense has been proven beyond a reasonable doubt is an issue for a jury to determine. *Mitchell v. State*, 931 S.W. 2d 950, 954 (Tex. Crim. App. 1996). And, to support a conviction, the State must corroborate an extrajudicial confession. *Emery v. State*, 881 S.W. 2d 702, 705 (Tex. Crim. App. 1994). However, the law does not require the State to corroborate an extrajudicial admission. *Padron v. State*, 988 S.W. 2d 344, 346 (Tex. App. – Houston [1st Dist.] 1999). The trial court did not err in admitting the life history statement of Appellant, and his seventh and eight points of error should be denied.

**POINT OF ERROR 9: Did the trial court err by admitting letters and drawings made by Appellant?**

### Statement of Facts

During the cross-examination of Dr. Antoinette McGarrahan, the State moved to introduce two letters written by Appellant. (RR XLII – 113). Appellant objected on the bases of authentication, relevance, and the probative/prejudicial balancing test. (RR XLII – 113). The State responded that the letters could be authenticated by having Dr. McGarrahan compare signatures on the letters with a known signature of Appellant with which she was familiar, or by recalling Appellant's wife. (RR XLII – 114). The State further offered that the letters and the drawings contained therein were relevant to rebut Dr. McGarrahan's testimony that Appellant was suffering from language, verbal skill, and fine motor skill deficits as a result of his medical history related to having a brain abscess. (RR XLII – 115). The letters reflected Appellant's ability to compose full-page letters, clearly express ideas, and to produce detailed drawings. (RR XLII – 115). The court overruled the objections and found that the probative value of evidence outweighed their prejudicial effect. (RR XLII – 116).

### Argument

The admission of evidence is a preliminary question to be decided by the trial court. *Tex. R. Evid* 104(a). To be admissible, the evidence must be relevant to a fact in controversy. *Tex. R. Evid.* 401, 402. A condition precedent to admissibility is authentication. *Tex. R. Evid.* 901(a). The trial

court itself need not be convinced the proffered evidence is authentic, but it must determine whether the proponent has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic. *Tienda v. State*, 358 S.W. 3d 633, 637-638 (Tex. Crim. App. 2012). Appellate review of a trial court's ruling on a primary question of admissibility is the deferential standard of abuse of discretion. If the trial court's ruling is at least within the zone of reasonable disagreement, the reviewing court should not interfere. *Id*; *Montgomery* at 391.

In the case at bar, Dr. McGarrahan had testified to Appellant's cognitive and motor deficits. The State offered the two letters to show that Appellant was capable of composing letters, that he had notable language and verbal skills, and was able to create intricate and detailed drawings. As such, the letters were relevant to rebut Dr. McGarrahan's testimony.

The State further proffered that the letters had been sent by Appellant while in jail and had been obtained from the jail mail. The letters were signed by him and addressed to his wife. Internally, the letters contained details regarding Appellant and his wife which indicated that they were written by Appellant. Finally, the State offered that either Appellant's wife could be called to authenticate the letters or Dr. McGarrahan could authenticate them by comparing the signatures with a signature known by her to be Appellant's in her treatment documents.

Finally, the court made the determination that the prejudicial effect of the evidence did not outweigh its probative value.

The trial court did not err in finding Appellant's letters to be relevant or authentic, and did not err in its determination that their probative value outweighed their prejudicial effect. Appellant's ninth point of error is without merit and should be denied.

**POINT OF ERROR 10: Did the trial court err in admitting a music video into evidence?**

**Statement of Facts**

During the punishment phase, a bench conference was held prior to the State's cross-examination of Appellant's brother, Lawrence Love. (XLI – 58-62). The State intended to introduce a music video that had been made by Lawrence Love as a commemorative to Emuel Bowers. (XLI – 58-59). Appellant, Lawrence Love and Shelia Bowers all appeared in the video, which had been made after Bowers' murder and before the Sneed and Hubert murders. (RR XLI – 58-59). The video contained numerous references to violent acts and gang-related activity. (RR XLI – 58-60). The State believed the video was relevant to rebut defensive contradictions of Appellant's gang affiliations, as well as to the punishment issues of future dangerousness and mitigation. (RR XLI – 58-60). Appellant objected on the bases that the video was not relevant, more prejudicial than probative, and that the door had not been opened to its admission by previous defensive evidence. (RR XLI – 59). The court overruled the objections, finding the video to be relevant and more probative than prejudicial. (RR XLI – 61-62).

## Argument

As discussed in previous points, the music video in question was presented in the punishment phase. It was relevant to issues of mitigation and future dangerousness. A key issue was Appellant's identity and lifestyle as a member of a criminal street gang. The video, in which Appellant prominently appeared, was rife with gang references, and glorified the violence of that lifestyle. The video constituted an adoptive statement by Appellant and went straight to mitigation issues. The trial court did not err in admitting the video as being relevant, and probative beyond any undue prejudice.

**POINT OF ERROR 11: Did the trial court err in refusing to ensure that the venire represented a fair racial proportion reflective of the county in which the offense was committed?**

### Statement of Facts

Appellant's motion to transfer venue was granted by the trial court, which ordered the transfer to Williamson County. (CR I – 130-134, 148). Appellant subsequently made a motion for the jury panel to reflect the racial make-up of the populations of McLennan County and/or the entire State of Texas. (CR I – 207-212). At the pretrial hearing on this motion, the State assured the court that it was aware of proper jury selection procedures, and that it would comply with the *Batson* line of case law as well as all the rules prescribed by law and judicial interpretation. (RR XII – 23). Appellant then asked to court to assure that the jury panel reflect the

47

demographics of McLennan County, as opposed to those of Williamson County. (RR IX – 24). In making its ruling on the motion, the court advised that, "We're going to make sure that all *Batson* issues are dealt with, all requirements that the Constitution of the United States and this State require to see – that are required to see that everyone gets a fair trial. But as to this specific motion, if you're asking me to have the Williamson County Clerk summon – pick out 20 percent of – make sure that the jury panel we assemble in this has a racial quota system in it, it's denied."

## Argument

In what Appellant denominates a case of first impression, he argues that he was denied a fair trial because the trial court did not ensure that the venire reflected a fair cross-section of the community where the offense occurred. As the State understands the issue, Appellant is asking this Court to create a means outside current constitutional and statutory law to require that the jury panel reflect specific racial proportions. The issue arises in this case due to Appellant's grant of a change of venue. As such, this supposed violation is, at least in part, one of Appellant's own making.

Appellant relies on *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed. 2d 579 (1979), and its progeny. The issue in *Duren* revolved around the proper formation of the venire, and addressed discriminatory practices in that area. It addressed remedies to ensure that the local venire panel reflect the local racial profile.

48

Appellant does not suggest that the formation of the Williamson County venire was done in violation of the constitutional safeguards enunciated in *Duren*. The State's position is that Appellant has not claimed or shown any error in the granting of the motion to transfer venue, or in the formation of the venire. No error is presented for the Court's consideration, and Appellant's eleventh point of error should be denied.

**Prayer**

For the foregoing reasons, the State of Texas prays that this Honorable Court affirm the conviction and punishment of ALBERT LOVE, JR. for the offense of CAPITAL MURDER, and prays for such other and further relief as may be provided by law.

Respectfully Submitted:
**ABELINO 'ABEL' REYNA**
Criminal District Attorney
McLennan County, Texas

/s/ Sterling Harmon
**STERLING HARMON**
Appellate Division Chief
219 North 6th Street, Suite 200
Waco, Texas 76701
[Tel.] (254) 757-5084
[Fax] (254) 757-5021
[Email]
sterling.harmon@
co.mclennan.tx.us
State Bar No. 09019700

49

## Certificate of Compliance

This document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i), if applicable, because it contains 12,011 words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

## Certificate of Service

I certify that I caused to be served a true and correct copy of this State's Brief by E-Filing Service on Appellant's attorney of record.

DATE: 2/27/15____                              /S/ STERLING HARMON_____

                                               STERLING HARMON